UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| KYLE RUTTER, | CASE NO. 3:21-CV-01883-JGC |
| Plaintiff, | JUDGE JAMES G. CARR |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Kyle Rutter filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On October 4, 2021, pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. (Non-document entry of October 4, 2021). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision.

### PROCEDURAL BACKGROUND

Mr. Rutter filed for DIB and SSI on July 19, 2019, alleging a disability onset date of January 15, 2019. (Tr. 58-59). His claims were denied initially and on reconsideration. (Tr. 58-83). He then requested a hearing before an Administrative Law Judge. (Tr. 86-87). Mr. Rutter

1

(represented by counsel), and a vocational expert (VE) testified at a hearing before the ALJ on December 2, 2020. (Tr. 34-56). On December 29, 2020, the ALJ issued a written decision finding Mr. Rutter not disabled. (Tr. 14-28). The Appeals Council denied Mr. Rutter's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-4; *see* 20 C.F.R. §§ 404.955, 404.981). Mr. Rutter timely filed this action on October 4, 2021. (ECF #1).

Factual Background[1]

## I.  Administrative Hearing

The following summarizes the testimony of Mr. Rutter and VE Mary Everts, presented during the hearing before the ALJ.

Mr. Rutter testified that in his last job (January 2019), he only remained employed for seven days. (Tr. 41). He was experiencing sciatica pain and he tried to continue working but the pain increased to the point that he could no longer do his job efficiently. (*Id.*). Prior to that, from March 2017 through July 2018, Mr. Rutter worked as a Senior Specialist II in a banking organization. (*Id.*). He provided back office phone support for the bank branches. (Tr. 42). This position was full-time and paid $17.89 per hour; he was not required to lift any weight. (*Id.*). He handled questions on banking policies; the position was computer- and phone-based. (Tr. 44-45). It required two weeks' training and then a thirty day training review period. (Tr. 45).

---

[1]  My Initial Order directed Mr. Rutter to complete a plaintiff's supplemental information sheet, and instructs parties to include a Statement of Facts in their briefs. (ECF #6, PageID 13-14). Mr. Rutter's filings did not comply with the Initial Order. (*See* Pl.'s Br., ECF #10). Accordingly, I summarize the evidence relevant to the claim Mr. Rutter has raised; all other arguments are deemed waived. *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003). Counsel are advised in the future to comply with all requirements of the Initial Order.

2

Mr. Rutter also worked full-time from June 2014 through August 2016 as a die setter on an auto press line. (Tr. 42). He was required to lift up to twenty pounds in that position. (*Id.*). From May 2013 to June 2014, Mr. Rutter worked full-time as an assembler applying stickers, serial tags, and literature to dryers; he was required to stand and to lift up to ten pounds in this position. (Tr. 43, 52). Finally, Mr. Rutter worked as a bank teller from September 2011 through April 2013; he had to lift coin boxes, weighing at most ten pounds. (Tr. 43-44).

Mr. Rutter related that he is unable to work due to pain going down to his lower extremities, predominantly on the left side. (Tr. 45). Flare-ups cause the pain to go down both sides, all the way to his toes. (*Id.*). Mr. Rutter rated the pain on a typical day as a seven on a ten-point scale. (Tr. 46). Mr. Rutter also struggles with depression and has difficulty getting out of bed most days. (Tr. 45-46). Mr. Rutter testified to complying with his prescribed medication and did not experience side effects. (Tr. 46). Even so, he indicated he believed his symptoms to be worsening. (*Id.*). He sees two professionals for his mental health care: he sees Robin Siefker weekly and Dr. Ed Kirkpatrick every three weeks. (Tr. 47).

Mr. Rutter estimated he could walk about twenty yards and lift/carry up to five pounds. (Tr. 47. He testified to having problems with short-term memory, concentration, and remembering instructions. (*Id.*). He did not usually have any problems getting along with others. (*Id.*). Mr. Rutter described that he could sit for ten or fifteen minutes before needing to either stand or lay down. (Tr. 49). He can stand for five minutes before needing to sit or lay down. (*Id.*). He can change positions between sitting and standing for about an hour and a half maximum before needing to lay down for a few hours. (*Id.*). He sometimes experiences weakness in his hands that causes him to drop items. (*Id.*). Any kind of physical activity—including sitting or standing—causes an increase in

pain. (*Id.*). The only thing that settles his pain is laying on his left side. (Tr. 50). He has panic attacks at least twice per week; they are triggered most often when things are not the way Mr. Rutter expects them to be. (Tr. 50-51).

Mr. Rutter spends most of his day lying in bed watching TV. (Tr. 48). His mother lives upstairs and she will cook for him; he is able to heat food in the microwave because he can sit down and wait while it cooks. (*Id.*). He can do his laundry with the assistance of a grip reach tool. (*Id.*). He does not clean the house, other than washing dishes. (*Id.*).

The VE then testified. She classified Mr. Rutter's past work as a data clerk, DOT 209.687-010, SVP 4, sedentary as classified and as performed; die setter, DOT 514.360-010, SVP 7, classified as medium but performed as light; bank teller, DOT 211.362-018, SVP 5, light as classified and as performed; and assembler, DOT 706.684-022, SVP 2, light as classified and as performed. (Tr. 52).

The ALJ posed the following hypothetical to VE Everts: assume a hypothetical individual of the claimant's age and education and the past jobs the claimant described; the individual is limited to light work with the following additional limitations: occasional climbing of ramps and stairs, never climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; never working at unprotected heights or with moving mechanical parts; the hypothetical individual is limited to superficial (requiring no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety and welfare of others) and infrequent (defined as two hours or less in an eight-hour day) interaction with coworkers and the public, with no over-the-shoulder supervision with supervisors; the individual can make simple work-related decisions. (Tr. 53). The VE responded

4

that the assembler position would likely fit into the above hypothetical, with the caution that if the individual is having some kind of difficulty, a supervisor may step in and supervise more closely. (Tr. 53-54).

Other work the individual could perform included work in the light unskilled category. (Tr. 54). Representative jobs included cleaner, DOT 323.687-014, SVP 2, approximately 200,000 jobs available nationally; inspector packer, DOT 559.687-074, SVP 2, approximately 7,000 jobs available nationally; and general office helper, DOT 239.567-010, SVP 2, approximately 10,000 jobs available nationally. (*Id.*).

The ALJ's second hypothetical contemplated sedentary work instead of light, and retained all other restrictions from the first hypothetical. (*Id.*). The VE testified a limitation to sedentary work would eliminate all past work. (*Id.*). However, the VE was able to identify other sedentary jobs available in the national economy, including document preparer, DOT 249.587-018, SVP 2, approximately 15,000 jobs available nationally; sorter, DOT 521.687-086, SVP 2, approximately 2,000 jobs available nationally; and inspector, DOT 669.687-014, SVP 2, approximately 5,000 jobs available nationally. (Tr. 54-55).

The third hypothetical contemplated an individual who was off-task more than fifteen percent of the time in an eight-hour workday, in addition to normal breaks, and who requires absences of two days or more per month. (Tr. 55). VE Everts testified no work would be available for an individual so limited. (*Id.*). In VE Everts' opinion, employers will generally allow one unexcused absence per month, including coming in late and leaving early. (*Id.*). It is work preclusive if someone is off task fifteen percent or more. (*Id.*). Employers find a requirement to lie down during work hours problematic and work preclusive. (*Id.*).

II.     PERSONAL AND VOCATIONAL EVIDENCE

Mr. Rutter was 26 years old at the time of his alleged onset date, and 27 years old at the time of the administrative hearing. (Tr. 27). Mr. Rutter completed high school. (*Id.*). In the past, Mr. Rutter has worked as a data clerk, auto press line die setter, assembler, and bank teller. (*Id.*).

III.    RELEVANT MEDICAL EVIDENCE

On August 22, 2018, Mr. Rutter presented to Center Street Community Health Center (CSCHC) for follow up on symptoms of depression and musculoskeletal pain. (Tr. 257). Mr. Rutter reported experiencing anxious and fearful thoughts and depressed mood. (*Id.*). He presented with an inappropriate, depressed mood and a flat affect. (Tr. 259). He was diagnosed with major depressive disorder, recurrent, moderate. (Tr. 260). At a previous visit, Mr. Rutter's medication had been changed from fluoxetine to bupropion; he was started on Zoloft for sleeplessness. (Tr. 257). Mr. Rutter reported his musculoskeletal pain in his right foot was at a severity level of two; it was improving such that Mr. Rutter felt the pain had gone away for the most part and he was just feeling discomfort. (*Id.*). Swelling was still present. (Tr. 257, 259).

On September 5, 2018, Mr. Rutter followed up with behavioral health at CSCHC, reporting depressed mood, problematic sleep, no energy, poor concentration, and feelings of hopelessness, worthlessness, and low self-esteem. (Tr. 262). Teresa Gilmore, LISW-S, found that treatment was necessary to maintain or improve Mr. Rutter's current level of functioning. (Tr. 263). At follow up on September 12, 2018, Mr. Rutter reported some improvement in depression and insomnia, but worsening anxiety symptoms. (Tr. 265). He agreed to try buspirone for continued anxiety symptoms. (*Id.*).

6

On September 20, 2018, Mr. Rutter arrived to his behavioral health appointment requesting assistance in completing short-term disability paperwork. (Tr. 270). He reported that he had lost his job on July 31, after not returning to work after May 11, 2018; he attributed the continued absence to his symptoms of depression. (*Id.*). Mr. Rutter was hopeful that the disability paperwork would possibly reverse his termination. (*Id.*). Ashley Degutis, APRN-CNP, indicated she would assist in filling out the paperwork; she instructed Mr. Rutter to continue taking his medications and attending counseling as prescribed. (Tr. 270, 272).

On October 17, 2018, Mr. Rutter reported "I think we may have finally gotten the meds right" in reference to his mental health symptoms. (Tr. 277). However, he also reported difficulty getting the correct dose of buspirone; NP Degutis adjusted the dosage accordingly. (Tr. 277).

X-rays of Mr. Rutter's lumbar spine from January 16, 2019, showed mild to minimal degenerative changes and some disc space narrowing. (Tr. 303). Emergency department physician David Androw, M.D., started Mr. Rutter on prednisone as an anti-inflammatory and Ultram as needed for pain. (Tr. 332).

On January 25, 2019, Mr. Rutter presented to CSCHC reporting back pain radiating to the left thigh. (Tr. 282). Mr. Rutter's pain was previously relieved with muscle relaxers, Tramadol and Toradol injections, but he reported at this visit that the pain was now causing him to feel nauseated. (*Id.*). Mr. Rutter was assessed as having left-sided sciatica; he was instructed to continue with his medications and attend physical therapy. (Tr. 283, 285).

At follow-up on February 22, 2019, Mr. Rutter reported his depression was worsening and his medications were no longer enough to control his symptoms. (Tr. 287). Mr. Rutter was still complaining of back pain; NP Degutis ordered an MRI of the lumbar spine. (*Id.*).

7

On April 11, 2019, Mr. Rutter met with Stephanie Young, PA-C, to review his lumbar MRI, which revealed moderate left paracentral disc protrusion containing an annular fissure and causing mild-moderate spinal canal stenosis and narrowing of the left lateral recess with possible compression of the descending left L5 nerve root. (Tr. 441-42). PA Young noted pain on the left, worsened by standing, walking, lifting, bending, and twisting; better with lying down. (Tr. 441). She recommended returning for surgical discussion with Robert Crowell, M.D., and provided Mr. Rutter a prescription for diclofenac 75 mg. (Tr. 442).

NP Degutis provided Mr. Rutter with a prescription for a metal walking cane on April 25, 2019. (Tr. 952).

At an April 29, 2019, appointment with Dr. Crowell, Mr. Rutter's radicular pain symptoms had failed to improve after three physical therapy sessions. (Tr. 309, 438). Physical therapy was discontinued early because the exercises tended to increase his symptoms of numbness. (*Id.*). (A March 4, 2019, physical therapy visit indicated Mr. Rutter "had an unexpected response to treatment" and his symptoms "quickly worsened with all exercises." (Tr. 354)). Mr. Rutter reported his pain was at a nine on a ten-point scale. (Tr. 309, 438). Dr. Crowell indicated an April 10, 2019, lumbar MRI showed advanced lower lumbar degenerative disc disease affecting the L4-L5 and L5-S1 levels. (Tr. 310, 439). This was worst at L4-L5, and included a moderate central/left paracentral disc protrusion containing an annular fissure. (*Id.*). No foraminal narrowing of the lumbar spine was seen. (*Id.*). Dr. Crowell reviewed the available operative and non-operative options available; Mr. Rutter elected to proceed with surgical intervention. (*Id.*).

On May 24, 2019, Dr. Crowell performed a left L4-L5 hemilaminotomy and discectomy to resolve a lumbar disc herniation on the left at L4-L5. (Tr. 321). There were no complications; Mr. Rutter tolerated the procedure well. (Tr. 322).

At post-surgical follow-up on June 5, 2019, Mr. Rutter reported improvement in his back pain and left leg weakness but increased tingling in his left leg. (Tr. 329-30, 436). He had no tenderness of the spine and normal motor strength, gait, and balance. (Tr. 330, 436-37). PA Young instructed Mr. Rutter to limit lifting to less than ten pounds, and no twisting or bending at the waist until six weeks post-op; he may then lift up to twenty pounds and continue with no twisting or bending at the waist until twelve weeks post-op. (*Id.*). His pain was controlled with current analgesics, which included oxycodone as needed. (Tr. 437, 551). PA Young prescribed Norco and gabapentin to see if it would improve the left leg tingling. (Tr. 330, 437,  552).

On July 17, 2019, Mr. Rutter presented to the emergency room with leg weakness and complaints of his legs "giving out;" he had experienced several falls. (Tr. 420-21). Emergency department notes indicated Mr. Rutter had lumbar spinal stenosis with L5 nerve compression, slightly progressed from the last CT scan, which included mild to moderate spinal canal stenosis and narrowing of the left lateral recess. (Tr. 420, 425-26, 430-31). Notes also included a comment that Mr. Rutter "has a cane but he has not been using it." (Tr. 420-21). Mr. Rutter was "encouraged to use the cane" and to follow up with Dr. Crowell. (*Id.*). On exam, Mr. Rutter showed decreased range of motion, tenderness, pain, and spasm; he walked with a slight limp, and the examiner noted there was a "question of mild weakness in the lower extremities." (Tr. 424-25).

At a postoperative follow-up appointment on July 25, 2019, Dr. Crowell assessed Mr. Rutter with radicular pain of the left lower extremity. (Tr. 507). Dr. Crowell noted that Mr. Rutter

"initially . . . had marked improvement in his back pain and some improvement in his radicular pain" but "over the past several weeks his pain has returned with a vengeance." (Tr. 433, 448, 511). Mr. Rutter reported pain at a ten on a ten-point scale, which Dr. Crowell noted was "worse than preop." (Tr. 433, 448-49, 511, 555). Mr. Rutter could heel and toe walk and arise from a seated position without limitation, but had an antalgic gait and sciatic notch tenderness on the left side. (Tr. 555). CT scans from the July 17th emergency department visit indicated postoperative changes consistent with Mr. Rutter's persistent symptoms. (Tr. 434, 449). However, the etiology of the exacerbation of his pain was unclear; Dr. Crowell postulated it may be a second area of nerve entrapment at the sciatic notch. (Tr. 434, 449, 512). Dr. Crowell planned for follow-up in three weeks, plus an MRI at that time if Mr. Rutter did not improve. (*Id.*).

MRI results on September 16, 2019, demonstrated central and bilateral paracentral disc protrusion at L4-L5, more pronounced than preoperative. (Tr. 493). There was no postoperative fluid collection identified. (*Id.*).

On August 22, 2019, NP Degutis noted worsening low back pain rated at a ten out of ten. (Tr. 959). Mr. Rutter was ambulating a cane; his symptoms were relieved by lying down. (*Id.*).

On August 26, 2019, Dr. Crowell again noted Mr. Rutter experienced "severe" pain on the left, with new numbness of the plantar surface of the left foot. (Tr. 485). Mr. Rutter exhibited left EHL 3+/5, left knee extension 4/5, and antalgic gait on the left, although he could heel/toe walk and rise from a seated position without limitation. (*Id.*).

On September 24, 2019, Mr. Rutter reported worsening symptoms of depression to NP Degutis after an increase in Zoloft; NP Degutis reduced the dosage to 25 mg once daily. (Tr. 965). By October 22, 2019, Mr. Rutter reported some improvement of initial symptoms, but still had

anxious and fearful thoughts. (Tr. 972). By December 11, 2019, NP Degutis noted Mr. Rutter had established care with a counselor and his medication regimen was managed by an outside provider. (Tr. 979, 993).

On October 16, 2019, Mr. Rutter reported experiencing neck pain and numbness in the left upper extremity. (Tr. 576). Dr. Crowell noted Mr. Rutter was morbidly obese. (*Id.*). Mr. Rutter's gait was antalgic on the left and he had pain with walking, with minimal improvement in symptoms with pain medications. (*Id.*). Dr. Crowell noted Mr. Rutter used a cane for ambulation because of pain issues. (*Id.*). On examination, Mr. Rutter showed decreased range of motion of the neck, and some give way weakness in his left shoulder abduction and finger abduction, but was able to perform the exercises with coaching and encouragement. (*Id.*). Straight leg testing was negative; Spurling's maneuver on the left produced left-sided neck pain but not radicular pain. (*Id.*). Cervical CT scan on October 24, 2019, indicated a suggestion of significant degenerative disc disease. (Tr. 577).

Dr. Crowell opined that he was "not optimistic" that resection would offer a significant change for dramatic pain improvement. (*Id.*). Fusion at L4-L5 and L5-S1 was "a hypothetical possibility" but it was an extensive procedure and as a 26-year-old, Mr. Rutter's chances for adjacent segment disease at L3-L4 were high. (*Id.*). Dr. Crowell encouraged Mr. Rutter to pursue physical therapy for his neck, and noted that if it failed to provide satisfactory improvement, surgery may be warranted even if it presented a limited probability for success. (*Id.*).

On January 6, 2020, Mr. Rutter presented to Dr. Crowell following an MRI from December 31, 2019. (Tr. 581-82). The MRI showed multilevel discogenic change in the cervical spine. (Tr. 732-33). Mr. Rutter's neck and upper extremity symptoms of radicular pain were of

greater severity than his lower extremity symptoms. (Tr. 581). Mr. Rutter also reported some sense
of difficulty with his grip. (*Id.*). Mr. Rutter failed to improve with a course of physical therapy and
time; he was going to meet with pain management later that day. (*Id.*). Dr. Crowell indicated there
was no significant surgically correctable pathology on the MRI results correlating with Mr. Rutter's
upper extremity symptoms. (Tr. 582).

Mr. Rutter met with Alexsey Prok, M.D., for pain management on January 6, 2020. (Tr.
587-92). Dr. Prok indicated that Mr. Rutter seemed desperate and had no surgical option for
improvement. (Tr. 582). However, Dr. Prok expected with pain management Mr. Rutter would be
able to get back to some meaningful activity. (*Id.*). On February 12, 2020, Dr. Prok conducted an
epidural injection of Depomedrol at C7-T1. (Tr. 599). Mr. Rutter tolerated the procedure well.
(*Id.*). However, Mr. Rutter reported to the emergency room the next day complaining of pain rated
ten out of ten. (Tr. 680).

Mr. Rutter reported to the emergency room on several other occasions for back pain,
numbness in his upper extremities, and radiculopathy in his lower extremities including on August
15, October 4, October 14, November 25, and December 6, 2019; and January 29, May 3, 17 and
22, June 19, and August 21, 2020. (Tr. 662, 680, 687, 700-01, 722, 743, 750, 756, 764, 785). Mr.
Rutter was at times given muscle relaxants and pain medications in the emergency department; he
was recommended to continue on his current medications and discharged with instruction to
contact his pain specialist or primary care provider. (Tr. 667, 670-71, 680, 687, 693-94, 701, 722,
756, 785). At follow up with NP Degutis on May 6, 2020, Mr. Rutter reported "minimal" relief
from morphine administered at the ER. (Tr. 999). NP Degutis advised him to follow up with Dr.
Prox. (*Id.*).

12

Mr. Rutter treated regularly with providers at Marion Independent Physicians Association for his bipolar disorder, major depressive disorder (with psychotic behavior), and generalized anxiety disorder. (Tr. 602-46, 815-951). He was recommended to receive individual therapy once weekly in addition to medication management. (Tr. 605-06). Mr. Rutter's mental health symptoms were characterized by anxiousness, feelings of depression and being "down and drained," fearful thoughts, angry outbursts, and recurring episodes of hearing voices or noises. (Tr. 602-03, 608, 833). Mr. Rutter also experienced frequent panic attacks, and reported having four panic attacks in November 2019. (Tr. 608). Mr. Rutter was compliant with his medications. (Tr. 614, 627, 639, 643, 817, 819, 827, 833, 837).

Providers noted poor recent memory and that Mr. Rutter's concentration was "largely affected by his constant physical pain." (Tr. 614, 622, 817, 819). In December 2019, Mr. Rutter reported harming himself to relieve his anxiety. (Tr. 625). By the end of the month, Mr. Rutter reported his mood was stable, symptoms were controlled, and stress was manageable. (Tr. 635). At follow-up in February 2020, his provider noted Mr. Rutter was responding well after including Latuda and was not experiencing side effects. (Tr. 627). On September 8, 2020, Mr. Rutter reported decreased mood swings and lessened depression after being switched to Vraylar, titrated off of Latuda, and adding Spravato. (Tr. 821). Mr. Rutter reported persistent depressive symptoms, although he reported improvement in September and October 2020 after his medications were adjusted. (Tr. 861, 872, 878, 1024).

## IV.   MEDICAL OPINIONS

**Donald McIntire, Ph.D.** On October 8, 2019, Mr. Rutter underwent a mental consultative examination by Donald McIntire, Ph.D. (Tr. 495-504). Mr. Rutter presented to the

appointment with a cane. (Tr. 500). Dr. McIntire noted Mr. Rutter's gross motor abilities appeared

impaired due to placing weight on the cane and because Mr. Rutter had difficulty rising from his

seat at the end of the examination. (*Id.*). Mr. Rutter reported no difficulties in learning jobs or

getting along with coworkers and supervisors. (Tr. 497). However, he reported problems in

multitasking, focus, and anxiety on the job. (*Id.*). He reported having to leave his work station to

calm down in the restroom before returning to work, as well as leaving early or being absent due to

anxiety symptoms. (*Id.*). Dr. McIntire indicated Mr. Rutter's abilities on examination were

consistent with his education, but that Mr. Rutter had underestimated his verbal memory abilities.

(Tr. 502).

Dr. McIntire indicated diagnoses of major depressive disorder, generalized anxiety disorder

and alcohol use disorder, in remission. (Tr. 503). Dr. McIntire noted Mr. Rutter was receiving

psychiatric medications from his primary care provider, but he also had an upcoming intake

appointment with a psychiatrist to begin treatment. (Tr. 502).

In the functional assessment, Dr. McIntire opined Mr. Rutter's ability to understand,

remember and follow basic instructions, and maintain attention and concentration to perform

simple, repetitive tasks was good; Mr. Rutter had fair ability to get along with coworkers; and poor

ability to manage the stress of everyday work life. (Tr. 503).

**State Agency Reviewers.** State agency medical consultant Anton Freihofner, M.D.,

reviewed Mr. Rutter's record at the initial level on December 19, 2019. (Tr. 68-74). He opined that

Mr. Rutter could occasionally lift/carry up to twenty pounds and up to ten pounds frequently. (Tr.

68-69). He could sit and stand/walk for a total of six hours of an eight-hour workday. (Tr. 69). Mr.

Rutter could frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch, and

14

crawl; he could never climb ladders, ropes, or scaffolds. (*Id.*). Mr. Rutter was to avoid even moderate exposure to hazards, including no unprotected heights, commercial driving, or slippery or uneven surfaces. (Tr. 70).

State agency psychological consultant David Dietz, Ph.D., reviewed at the initial level on November 1, 2019. (Tr. 70-72). He opined that Mr. Rutter had mild limitations in understanding, remembering, or applying information; and moderate limitations in interacting with others, concentrating, persisting, and maintaining pace, and adapting or managing himself. (Tr. 66). Mr. Rutter had no limitations related to understanding and memory; he had moderate limitations in sustained concentration and persistence, social interaction and adaptation. (Tr. 70-72). Dr. Dietz opined Mr. Rutter could complete a wide variety of tasks in a setting without frequent changes, strict production quotas or fast pace, that working with the general public would be anxiety provoking but he could relate to coworkers and supervisors adequately, and that he could adapt to a setting in which day to day duties were routine and predictable. (*Id.*). Mr. Rutter was found able to perform work at the light level of exertion with additional limitations and determined not disabled. (Tr. 73-74).

At reconsideration, Mr. Rutter's record was reviewed by Leanne Bertani, M.D., on April 16, 2020. (Tr. 78-81). Dr. Bertaini did not adopt all of Dr. Freihofner's limitations after her review of additional evidence in the file. (Tr. 80). She adopted most of the exertional and postural limitations, but found that Mr. Rutter would only be able to stand and/or walk for four hours during the workday and perform occasional push/pull with the left lower extremity. (Tr. 79-80). She also opined that Mr. Rutter was to have no concentrated exposure to unprotected heights. (Tr. 80).

15

Cindy Matyi, Ph.D. reviewed Mr. Rutter's record on March 3, 2020. (Tr. 81-82). Dr. Matyi affirmed the initial level findings but provided minor clarifying changes. (Tr. 82). She opined that Mr. Rutter could carry out simple and occasional complex/detailed tasks, maintain attention, make simple decisions, and adequately adhere to a schedule; he was susceptible to misinterpreting interpersonal nuance but could relate adequately on a superficial basis in an environment that entails infrequent public contact, minimal interaction with coworkers and no over-the-shoulder supervisor scrutiny; he could adapt to settings in which day-to-day duties are routine and predictable. (Tr. 81-82).

**Karen Rittenhouse, OTR/L**. Ms. Rittenhouse performed a two-day physical functional capacity evaluation of Mr. Rutter on August 24 and 25, 2020. (Tr. 1048-56). Ms. Rittenhouse noted that Mr. Rutter exhibited self-limiting behavior, stating his "perception of abilities is less those [he] was actually able to do. (Tr. 1048). On the first day of testing, Mr. Rutter reported his pain was an eight on a ten-point scale; it was a seven on the second day of testing. (*Id.*).

Ms. Rittenhouse opined that Mr. Rutter could lift up to twenty pounds and push/pull approximately fifty pounds; perform frequent sitting; and perform occasional elevated work, forward bending-standing, and kneeling. (Tr. 1049). She noted average bilateral gross and fine motor hand coordination skills. (*Id.*).

Ms. Rittenhouse further opined Mr. Rutter had self-limiting behaviors for lifting tasks; he should rarely perform standing work, walking, and stairs with the use of a straight cane. (*Id.*). She opined Mr. Rutter was unable to crouch or climb ladders. (*Id.*). Ms. Rittenhouse noted that his hand grip strength measured significantly below average, but did not have any strength deficit with composite grip testing. (*Id.*).

16

THE ALJ'S DECISION

The ALJ's decision, dated December 29, 2020, included the following findings of fact and

conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security
     Act through December 31, 2023.

2.   The claimant has not engaged in substantial gainful activity since January 15,
     2019, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: degenerative disc disease,
     depression, obesity, anxiety, and substance addiction disorder. (20 CFR
     404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments
     that meets or medically equals the severity of one of the listed impairments
     in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525,
     404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, I find that the claimant has
     the residual functional capacity to perform sedentary work as defined in 20
     CFR 404.1567(a) and 416.967(a) except lifting and/or carrying less than ten
     pounds frequently and ten pounds occasionally. The claimant can stand or
     walk for two hours. The claimant can climb ramps and stairs occasionally,
     but never climb ladders, ropes or scaffolds. The claimant can balance, stoop,
     kneel, crouch or crawl occasionally. The claimant can never work at
     unprotected heights or around moving mechanical parts. The claimant is able
     to perform simple, routine and repetitive tasks. He is limited to superficial
     and infrequent interaction with coworkers and the public with no over the
     shoulder supervision with supervisors. The claimant is able to make simple
     work-related decisions.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565
     and 416.965).

7.   The claimant was born on December 31, 1992 and was 26 years old, which
     is defined as a younger individual age 18-44, on the alleged disability onset
     date (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education (20 CFR 404.1564 and
     416.964).

9.   Transferability of job skills is not material to the determination of disability
     because using the Medical-Vocational Rules as a framework supports a

17

finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 15, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19-28).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the

ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner

follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is

disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One

through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

establish whether the claimant has the residual functional capacity (RFC) to perform available

work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity,

age, education, and past work experience to determine if the claimant could perform other work.

*Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work,

and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-

(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

**I.    The ALJ erred in evaluating the medical source opinions and the RFC is not supported by substantial evidence.**

Mr. Rutter brings one error for this Court's review: whether the ALJ erred in evaluating

the medical source opinions and medical record. (Pl.'s Br., ECF #10, PageID 1105, 1109-13). He

contends the ALJ erred by finding medical opinion evidence persuasive but not explaining his

20

reasoning when he did not incorporate all findings. (*Id.* at PageID 1111). The Commissioner opposes, arguing that the ALJ's evaluation of medical opinion evidence was reasonable, and that the ALJ's incorporation of certain findings but not others into the RFC was reasonable and supported by substantial evidence. (Comm'r's Br., ECF #11, PageID 1116, 1124-33). For the reasons that follow, I find the Commissioner's argument unpersuasive and recommend the District Court remand.

> ### A.    The ALJ erred when evaluating the medical source opinions and limitations opined by Dr. McIntire.

Mr. Rutter argues the ALJ reversibly erred in evaluating the medical source opinions, because he found the opinions of Dr. McIntire and Ms. Rittenhouse persuasive but did not incorporate all of their opined limitations into the resulting RFC. (Pl.'s Br., ECF #10, PageID 1109). Mr. Rutter further contends, even if the ALJ appropriately chose not to incorporate all limitations into the RFC, he failed to provide sufficient explanation as to why certain limitations were not included. (*Id.* at PageID 1111 ("Where, as here, an ALJ determines that an opinion or finding is persuasive, the ALJ must incorporate the limitations in that opinion or finding—or provide an adequate explanation for declining to do so."); *see also* Pl.'s Reply Br., ECF #12, PageID 1136-37).

The Commissioner counters that the ALJ was not required to incorporate all limitations in the RFC, even those opined by a persuasive medical source or described as work-preclusive in VE testimony. (Comm'r's Br., ECF #11, PageID 1127-29). The Commissioner notes that the "revised regulations were designed to be consistent with a 'reasonable articulation standard' that 'does not require written analysis about how [the adjudicator] considered each piece of evidence'" but only provide explanation sufficient to 'allow a subsequent reviewer . . . to trace the path of an

21

adjudicator's reasoning.'" (*Id.* at PageID 1127-28, *citing* 82 Fed. Reg. 5844-01, at 5858). The Commissioner argues against remand, because the ALJ was not under a duty to incorporate all opined limitations even if he found the medical source opinion persuasive, and because the ALJ provided sufficient explanation as to why he did not incorporate those limitations. (*Id.* at 1129).

I agree with the Commissioner's articulation of the revised regulations. However, I disagree with the Commissioner's assertion that "[t]he ALJ did what he was required to do under the regulations." (*Id.*).

Because Mr. Rutter filed his application after March 27, 2017, his case is evaluated under the regulations found in 20 C.F.R. §§ 404.1520c and 416.920c. Under these revised regulations, the ALJ is to articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. §§ 404.1520c(b) and 416.920c(b). The regulations define a medical opinion as "a statement from a medical source about what [the claimant] can still do despite [his] impairment(s) and whether [the claimant has] one or more impairment-related limitations or restrictions" in the ability to perform physical demands of work activities, the ability to perform mental demands of work activities, the ability to perform other demands of work, and the ability to adapt to environmental conditions. 20 C.F.R. §§ 404.1513(a)(2) and 416.1513(a)(2).

The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *Id.* at §§ 404.1520c(a) and 416.920c(a); *see also Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). Instead, the ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important

factors" of supportability[2] and consistency.[3] 20 C.F.R. §§ 404.1520c(b) and 416.920c(b). An ALJ must explain how the ALJ considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. §§ 404.1520c(b)(2)-(3) and 416.920c(b)(2)-(3).

Agency regulations no longer require deference to a treating physician's opinion, but the reason-giving requirement still exists so a claimant (and the reviewing court) may understand the disposition of their claim. *Hardy v. Comm'r of Soc. Sec.*, 554 F. Supp. 3d 900, 908 (E.D. Mich. 2021) (applying the reason-giving requirement "with equal force to the new regulations, which require explanations for determinations that a medical opinion is unpersuasive."). While the new regulations may be less demanding than the former rules, "they still require that the ALJ provide a coherent explanation of [his] reasoning." *Lester v. Saul*, No. 20-01364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted*, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021). And, "because of the greater latitude afforded ALJs under the new regulations, the importance of cogent explanations is perhaps even more important." *Hardy,* 554 F. Supp. 3d at 908. Agency regulations "set forth a 'minimum level of articulation' to be provided in determinations and decisions, in order to 'provide sufficient rationale for a reviewing adjudicator

---

[2]    "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[3]    "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

or court.'" *Warren I. v. Comm'r of Soc. Sec.*, No. 20-495, 2021 WL 860506, at *8 (N.D.N.Y. Mar. 8, 2021) (quoting 82 Fed. Reg. 5844-01 (2017)). An "ALJ's failure . . . to meet these minimum levels of articulation frustrates [the] court's ability to determine whether [the claimant's] disability determination was supported by substantial evidence." *Vaughn v. Comm'r of Soc. Sec.*, No. 20-1119, 2021 WL 3056108, at *11 (W.D. Tenn. July 20, 2021).

When evaluating a claimant's impairment, the ALJ must provide sufficient explanation for the claimant and any reviewing court to "trace the path of his reasoning." *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) (internal quotations omitted). However, the ALJ is not required to provide an exhaustive account at each stage of the analysis; rather, an ALJ's opinion is read "as a whole and with common sense." *Avery*, 2020 WL 2496917, at *13 (citing *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678 (7th Cir. 2010)). An ALJ must articulate the reasoning enough to permit meaningful review. *Id.*

Here, Dr. McIntire opined that Mr. Rutter had a "poor" ability to manage work stress and would "often leave his work station, or leave the work site to go home, or fail to get to work." (Tr. 503). Mr. Rutter argues the ALJ should have incorporated corresponding limitations into the RFC, and points out "[n]ot only did the ALJ reasonably find Dr. McIntire's opinion persuasive, but the state agency reviewing psychologists also opined that Dr. McIntire's opinions 'are well supported by the objective evidence noted during MSE and clinical interview and are consistent with other file evidence.'" (Pl.'s Br., ECF #10, PageID 1109, *citing* Tr. 68, 503). Thus, Mr. Rutter asserts it was error for the ALJ to find Dr. McIntire's opinion persuasive and consistent with the medical record, but fail to incorporate or to explain why he did not include such limitations. (*Id.* at PageID 1109-10).

Comparing the ALJ's evaluation of the mental status opinion evidence discloses reversible error:

> I do not find the opinions of the State agency medical consultants because, although they are acceptable medical sources with knowledge of and experience with the social security benefits programs whom had the opportunity to independently and thoroughly review the records before them, they did not have the benefit of a treating relationship with the claimant or the records received at the hearing level. . . . the claimant's mental health impairments support a limitation to simple, routine tasks rather than having an ability to carry out detailed instructions. The herein social restrictions are also appropriate in light of the claimant's anxiety of being around others. Thus, their opinions may have been applicable at the times provided but are currently inconsistent with the totality of the evidence in this case.
>
> I find the opinions of consultative examiner Donald H. McIntire, Ph.D. to be persuasive, as he is an acceptable medical source whom had the opportunity to examine the claimant. Further, the opinions are supported and consistent with the medical evidence of record. Specifically, the record shows largely unremarkable mental status examinations, which was consistent with Dr. McIntire's examination findings. Further, the claimant was able to follow instructions, was a reliable historian and cooperative with the examiner, which is supported by and consistent with the medical evidence of record.

(Tr. 26) (internal citations omitted). The ALJ does not provide an articulation of the persuasiveness *vel non* of the State agency medical opinions, and thus, I cannot determine if the RFC with respect to Mr. Rutter's mental health issues is supported by substantial evidence, or whether the ALJ appropriately considered all medical opinion evidence when forming the mental status RFC.

It is readily apparent, however, that the ALJ did not meet the minimum articulation standard and has thereby frustrated this Court's review. This is not a mere scrivener's error. "A scrivener's error is a transcription error or a typographical error." *Hudon v. Astrue*, No. 10-CV-405-JL, 2011 WL 4382145, at *4 (D.N.H. Sept. 20, 2011) (*citing U.S. Nat'l Bank of Ore. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 462 (1993)). And, in the social security context, "errors in ALJ

decisions have been excused as mere scrivener's errors when the ALJ's intent was apparent." *Id.* Even "minimal" distinctions in an ALJ's articulation can require remand. *Douglas v. Astrue*, No. 1:09-1349-CMC-SVH, 2010 WL 3522298, at *5 (D.S.C. Sept. 3, 2010) (finding it was not a scrivener's error for the ALJ to include a limitation to SVP 1 and remanding because the court could not determine the ALJ's intent. "Neither the decision nor the record provides sufficient information to determine whether the ALJ . . . unintentionally omitted 'or 2' from his RFC assessment."); *compare id. with, e.g., Poppa v. Astrue,* 569 F.3d 1167, 1172 n. 5 (10th Cir. 2009) (noting a scrivener's error where the ALJ misstated a claimant's surgical dates because the ALJ correctly stated the dates earlier in the decision and the error did not affect the outcome of the case); *Duron v. Comm'r of Soc. Sec.*, No. 1:20-CV-112, 2021 WL 972808, at *4 (W.D. Mich. Mar. 16, 2021) (finding a scrivener's error with respect to the ALJ's articulation of a prior decision date); *Butterick v. Astrue,* No. CIV-09-986-D, 2010 WL 2610790, at *7 (W.D. Okla. May 7, 2010) (describing "obvious typographical errors" in the ALJ's decision but finding no reversible error), *report and recommendation adopted*, 2010 WL 2610291 (W.D. Okla. June 24, 2010), *aff'd,* 430 F. App'x 665 (10th Cir. 2011).

It is the role of the ALJ, not this Court, to weigh the evidence, resolve significant conflicts in it, and make appropriate determinations based on the evidence presented. *Bradley v. Sec'y of Health & Hum. Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988). Although the ALJ's omission may be a small one, to conclude that it was a mere scrivener's error "would require this Court to improperly speculate about the ALJ's intent." *Pleger v. Kijakazi*, No. CV 20-261E, 2022 WL 205728, at *2 (W.D. Pa. Jan. 24, 2022).

26

I cannot say the ALJ's intent was apparent, and any insertion of corrective language would lead me to speculate about the ALJ's intent. I decline to conflate the roles of the ALJ and this Court by attempting to contextualize the ALJ's intent and correct his omission.

Because of the omission of critical language when articulating the persuasiveness of all opinion evidence, I am unable to "trace the path" of the ALJ's reasoning. Even when reading the ALJ's decision as a whole, I cannot determine the ALJ's intent, and may not insert my own reasoning in its place. Under such circumstances, remand is required.

**B.      The ALJ did not follow agency procedure when evaluating Mr. Rutter's need for a cane as opined by Ms. Rittenhouse.**

Mr. Rutter next argues the ALJ did not correctly evaluate Ms. Rittenhouse's opinion, stating "the ALJ found examiner Karen Rittenhouse's opinions 'for the most part persuasive' but completely failed to explain why he did not incorporate [Ms.] Rittenhouse's finding that Rutter required the use of a cane for safe performance and work." (Pl.'s Br., ECF #10, PageID 1110, *citing* Tr. 26, 1048-49). The Commissioner argues that the use of a cane fails because Mr. Rutter did not follow SSR 96-9p and has not pointed to medical records to establish that a cane was medically necessary. (Comm'r's Br., ECF #11, PageID 1130-31).

The Commissioner correctly articulates SSR 96-9p's standard, but my review of the record discloses that Mr. Rutter has pointed to evidence showing he may require a cane. I agree with Mr. Rutter that the ALJ did not sufficiently explain why the use of a cane was not incorporated into the RFC. I therefore recommend remand.

The ALJ is responsible to form an RFC appropriate to the claimant's abilities, supported by the ALJ's evaluation of the medical evidence. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). The RFC is to be an assessment of the claimant's remaining capacity for work, once

the claimant's limitations have been considered. *Id.* at 632. An ALJ is to consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ also must determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.* An ALJ "is only required to incorporate those limitations which he has deemed credible" and may reject limitations or impose more restrictions. *Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010). Doing so does not mean an RFC is not supported by substantial evidence. *Ross v. Comm'r of Soc. Sec.*, No. 14-11144, 2015 WL 1245830, at *11 (E.D. Mich. Mar. 18, 2015).

With respect to whether a cane is necessary to include in a claimant's RFC, agency regulations instruct as follows:

> **Medically required hand-held assistive device:** To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

> Since most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledgers and files and a maximum lifting capacity for only 10 pounds, an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand. For example, an individual who must use a hand-held assistive device to aid in walking or standing because of an impairment that affects one lower extremity (e.g., an unstable knee), or to reduce pain when walking, who is limited to sedentary work

because of the impairment affecting the lower extremity, and who has no other functional limitations or restrictions may still have the ability to make an adjustment to sedentary work that exists in significant numbers. On the other hand, the occupational base for an individual who must use such a device for balance because of significant involvement of both lower extremities (e.g., because of a neurological impairment) may be significantly eroded.

SSR 96-9p.[4] A claimant's contention that an assistive device is required does not satisfy SSR 96-9p's requirements without corresponding support in the medical record. *Parrish v. Berryhill*, No. 1:16-CV-1880, 2017 WL 2728394, at *11 (N.D. Ohio June 8, 2017), *report and recommendation adopted sub nom. Parrish v. Comm'r of Soc. Sec.*, 2017 WL 2720332 (N.D. Ohio June 23, 2017) (collecting cases). "To be considered a restriction or limitation, a cane must be so necessary that it would trigger an obligation on the part of the Agency to conclude that the cane is medically necessary, i.e., the record must reflect 'more than just a subjective desire on the part of the plaintiff as to the use of a cane.'" *Austin v. Comm'r of Soc. Sec.*, No. 1:19-CV-2380, 2020 WL 9460505, at *13 (N.D. Ohio July 7, 2020), *report and recommendation adopted*, No. 1:19-CV-2380, 2021 WL 1540389 (N.D. Ohio Apr. 19, 2021) (internal quotations omitted); *see also Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002) ("Because the cane was not a necessary device for claimant's use, it cannot be considered an exertional limitation that reduced her ability to work.").

An ALJ may thus find that a handheld assistive device is not medically necessary, even if a claimant regularly uses a cane, if the record evidence does not otherwise disclose the type of

---

[4]     The Commissioner's implication that the ALJ's RFC is responsive to Mr. Rutter's need for a cane because "the ALJ limited [Mr. Rutter] to sedentary work, which represents a 'significantly restricted range of work' and mostly requires sitting" (Comm'r's Br., ECF #11, PageID 1130) has no persuasive value. As SSR 96-9p describes, an individual who requires a cane "may still have the ability to make an adjustment to sedentary work." Thus, a sedentary RFC alone, without articulated consideration of Mr. Rutter's need for a cane, is insufficient to show that substantial evidence supported the RFC findings.

information SSR 96-9p requires. However, an ALJ can commit reversible error when: (i) the claimant has a prescription for an assistive device; (ii) the ALJ does not include the use of the assistive device in the RFC; and (iii) the ALJ does not provide an explanation for the omission. *Austin*, 2020 WL 9460505 at *13.

It appears that Mr. Rutter satisfies both the requirements of SSR 96-9p, as well as the three-part test described in *Austin*. Mr. Rutter has a prescription for a cane, prescribed for him by NP Degutis. (Tr. 952). Mr. Rutter has also pointed to Ms. Rittenhouse's opinion, which describes his need for a cane and certain circumstances in which he needs it: "standing work, walking, and stairs with the use of straight cane." (Tr. 1049). The ALJ declined to incorporate use of a cane into the RFC. (Tr. 21-22). The ALJ at times mentions Mr. Rutter's use of a cane, including:

- "The claimant alleges that his mobility is more limited and needs to use a cane when walking." (Tr. 22)

- "He reported using a cane for ambulation." (Tr. 24).

However, these two brief mentions provide insufficient articulation for me to determine the ALJ's reasoning in declining to incorporate use of a handheld assistive device in the RFC. The ALJ does not mention Mr. Rutter's prescription for a cane, he does not reference Ms. Rittenhouse's opined limitation or her description of when a cane is necessary, and makes no mention of SSR 96-9p or its requirements. (Tr. 21-27).

I therefore recommend the District Court remand for the ALJ to reassess Mr. Rutter's RFC with instruction to consider Ms. Rittenhouse's findings regarding Mr. Rutter's use of a cane and articulate the reasoning for his RFC determination.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I find the Commissioner's decision denying disability insurance benefits and supplemental security income not supported by substantial evidence and recommend the decision be reversed.

Dated: September 2, 2022

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v. Dahl,* **928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object."** *Howard v. Sec'y of Health and Hum. Servs.,* **932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'"** *Overholt v. Green,* **No. 1:17-CV-00186, 2018 WL 3018175, at \*2 (W.D. Ky. June 15, 2018) (quoting** *Howard,* **932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice.** *See United States v. Wandahsega,* **924 F.3d 868, 878-79 (6th Cir. 2019).**